*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIS CASS, LLC,

        Plaintiff/Counterdefendant-Appellant,

v

RENIS II, LLC,

        Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
August 17, 2023

No. 361612
Wayne Circuit Court
LC No. 19-013175-CB

WILLIS CASS, LLC,

        Plaintiff/Counterdefendant-Appellee,

v

RENIS II, LLC,

        Defendant/Counterplaintiff-Appellant.

No. 362366
Wayne Circuit Court
LC No. 19-013175-CB

Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

These appeals arise out of a dispute between a commercial landlord and a commercial tenant who entered into a nontraditional lease agreement. In Docket No. 361612, plaintiff Willis Cass LLC appeals as of right the trial court's May 13, 2022 opinion and order granting defendant RENIS II LLC's motion for summary disposition. In Docket No. 362366, defendant RENIS II LLC appeals as of right the trial court's July 14, 2022 opinion and order denying its motion to reopen the case and award attorney fees. For the reasons set forth in this opinion, we affirm in Docket No. 361612 and remand this matter for further proceedings in Docket No. 362366.

## I. BACKGROUND

In June 2010, Midtown Development Group II, Inc., a limited liability corporation solely owned and operated by Robert Slattery, entered into a 10-year "PARKING LOT LEASE" agreement with defendant, a limited-liability company that does business as "Slows To Go," for a "20' x 150' strip of land located North of 4107 Cass Avenue" "to be used as a parking lot . . ."[1] [the "Slow's Lot"]. As part of the lease, defendant negotiated an opportunity to purchase the Slow's Lot for $10,000. Notably, the lease required defendant to construct and develop a different parking lot located nearby at 441 West Willis Street [the "West Lot"] for Midtown's use as the "base rent" for the Slow's Lot.[2]

It did not take very long after they entered into that agreement for a dispute between Midtown and defendant to arise. In fact, on June 21, 2011, just a year after they entered into the agreement, Midtown began a string of emails with defendant ordering defendant to stop all work on the parking lot: "Please stop all work on parking lot[.] [W]ork to date is unsatisfactory." Midtown stated that the fence was below grade and a lighter gauge than the fence on Slow's Lot. On June 29, 2011, Midtown via email declared defendant "in default" due to a dispute over the quality of work done on the Slow's Lot versus the West Lot and defendant's "refusal" to "correct the deficiencies." After waiting a few weeks for defendant to cure the alleged default, Midtown again emailed defendant that it was "in default" and threatened to "cancel the lease" if the default was not cured. Unhappy with defendant's actions, Midtown terminated the lease by e-mail on July 21, 2011: "Since we have been unable to agree on an equitable corrective action[,] I am rescinding the lease. Please provide the documentation on the cost of the fence and paving on the leased portion and the paving of the lot on 441 West Willis[;] I will reimburse you."

Undeterred, defendant did not leave the property after the July 21, 2011 termination, and Midtown did nothing to enforce its decision to terminate the lease. Instead, Midtown apparently provided defendant more opportunities to cure before eventually threatening eviction proceedings on November 10, 2011. Nothing ever came of this threat either. Instead, according to plaintiff's first motion for summary disposition in the trial court, defendant remained in possession of the property for another year before Midtown terminated the lease again on October 15, 2012.

By the end of 2012, the dispute was far from over. In the middle of this dispute, Midtown filed for bankruptcy on February 12, 2014. In March 2014 when it filed its bankruptcy Schedule B, Midtown was required to list "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," as well as an "estimated value of each." Midtown listed none. On Schedule G (Executory Contracts and Unexpired Leases), Midtown again did not list its lease with defendant; instead, it described it as

---

[1] The lease permitted defendant to develop and use the parking lot on the 20' x150' strip of land north of Slow's restaurant located at 4107 Cass Avenue [Slow's Lot], pay all utilities for the Slow's Lot, pay $1,200 per year for property taxes, and provide Midtown with $600 in gift certificates annually for food and "preferred seating" at one of defendant's restaurants.

[2] Construction of the West Lot at 441 West Willis was "as per the plans approved by the City of Detroit Building & Safety Engineering Department dated 3/26/2010" and installation of "a six[-] foot high black fence per Lessor's specifications."

a "Parking Lot lease" with "Robert Slattery." Midtown never amended its bankruptcy petition in this regard, and it never identified any potential lawsuits against defendant with respect to the lease throughout the bankruptcy proceedings.[3] The bankruptcy court confirmed Midtown's plan of reorganization and granted final approval of the disclosure statement on July 15, 2014. On August 15, 2014, one month after the bankruptcy court entered its confirmation order, Midtown declared defendant "in default" again and made several demands for defendant to cure the alleged default within 10 days. Defendant responded on September 19, 2014, informing Midtown that it was sending notices to defendant's old address and stating its intention to complete the concrete and fence work on the West Lot "as soon as you allow us on your property." On September 24, 2014, Midtown terminated the lease for a third time:

> [Defendant] failed to give notice to Midtown Development Group, Inc of change of address, proper notice period according to the lease section 23 defaults to the first attempted delivery which was August 16, 2014. Ten days to cure has passed.
>
> Therefore, [defendant] is in default, and Midtown Development Group, Inc **terminates the lease**. [Emphasis in original.]

Unfortunately, this third termination notice did not mark the end of the lease or the parties' disputes.

On May 22, 2015, Midtown's attorney sent a letter stating that defendant defaulted in performing improvements that the lease required, demanding payment of $21,499 for the improvements Midtown completed, and advising that the lease would "terminate without further notice" on June 30, 2015, if its demand for payment were not met:

> We are counsel to Midtown Development Group, Inc. ("Midtown"). We are authorized and directed to send you this notice on Midtown's behalf. You have previously received the enclosed letter from Midtown describing your default in performing the improvements your lease required you to make. You did not make the improvements, and as a result Midtown has done the work at a cost of $21,499. Copies of the invoices are enclosed with this letter.
>
> You continue to be in default under your lease. If that default is not cured by payment of $21,499 and all other accruing rent obligations by June 30, 2015, your lease will terminate without further notice. Please note that if you have not cured the default by that date, you will no longer have the right to continue the lease or to reinstate the lease by an untimely cure.

---

[3] The June 12, 2014 Midtown Development Group, Inc's Third Amended Combined Plan of Reorganization and Disclosure Statement in the Chapter 11 bankruptcy proceedings referenced the West Lot, Slow's Lot, the parking lot lease and the details of the lease (see pages 32-33); this document was drafted by Midtown's attorneys. It referenced nothing with respect to any claims Midtown had against defendants.

As with the prior "terminations," i.e., the July 21, 2011 termination, the October 15, 2012 termination, and the September 24, 2014 termination, the June 30, 2015 termination (via the May 22, 2015 letter) did not resolve the parties' disputes. On September 27, 2019, things changed, however, when defendant decided to exercise its "Option to Purchase" under the lease. Less than a week later, on October 2, 2019, plaintiff filed this lawsuit, identifying itself as the assignee of Midtown's rights under the lease. Plaintiff is a limited-liability company that is owned and operated by Slattery.

After defendant filed a counterclaim, both parties amended their pleadings and engaged in two rounds of summary-disposition briefing; the trial court ultimately decided to dismiss plaintiff's claims in full and rule in defendant's favor "to the extent that it is entitled to enforce its option to purchase, and shall become owner of the leased property upon payment of: (1) the purchase price called for in the lease; and (2) the past-due money for property taxes and gift cards." According to that May 13, 2022 opinion and order, "[t]his ruling resolve[d] the last pending dispute between the parties and closes the case." But it did not, because less than two weeks later, on May 26, 2022, defendant filed a "Motion to Reopen Case and to Award Attorney Fees," asking the trial court to reopen the case to address its request for attorney fees under the lease's "Lessors Fees and Expenses" provision, a provision both parties referenced when originally seeking attorney fees.

Five days after defendant filed this motion in the trial court, plaintiff filed its claim of appeal in this Court in Docket No. 361612. And on the same day that it filed its claim of appeal, plaintiff also filed a response to defendant's motion in the trial court, arguing that its same-day filing of the claim of appeal prevented the trial court from substantively addressing defendant's motion. In its opinion and order dated July 14, 2022, the trial court agreed with plaintiff and held "that MCR 7.208(A) precludes the Court from awarding the relief sought in this motion and, therefore, the motion is denied." Nevertheless, the trial court made it clear that its decision was "without prejudice, and does not preclude Defendant from enforcing its claim for attorney fees in subsequent proceedings . . . ." Defendant appealed this decision in Docket No. 362366.

## II. ANALYSIS

### A. JUDICIAL ESTOPPEL

In Docket No. 361612, plaintiff raises three issues, but this Court need only address one: judicial estoppel. Plaintiff argues that the trial court either failed to address the application of judicial estoppel to its claim to quiet title or, if it did, incorrectly concluded that the claim was barred by judicial estoppel. In our view, the trial court reached the right outcome, even if its decision did not substantively address the application of judicial estoppel to plaintiff's quiet title claim.

"Judicial estoppel is an equitable doctrine." *Szyszlo v Akowitz*, 296 Mich App 40, 46; 818 NW2d 424 (2012). "[T]his Court reviews de novo equitable decisions." *Wengel v Wengel*, 270 Mich App 86, 91; 714 NW2d 321 (2006). This Court also "review[s] de novo a trial court's summary disposition ruling." *Szyszlo*, 296 Mich App at 46. A trial court's decision to grant summary disposition under the doctrine of judicial estoppel involves MCR 2.116(C)(7). *Wells Fargo Bank, NA v Null*, 304 Mich App 508, 517; 847 NW2d 657 (2014). For purposes of a motion under MCR 2.116(C)(7), a court is tasked with deciding "whether the moving party was entitled

-4-

to judgment as a matter of law." *Id*. at 518. "The contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999).

"Judicial estoppel is an equitable doctrine, which generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Spohn v Van Dyke Pub Sch*, 296 Mich App 470, 479; 822 NW2d 239 (2012) (quotation marks and citation omitted). "This doctrine is utilized in order to preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Id*. at 479-480 (quotation marks and citation omitted). "For judicial estoppel to apply, a party must have successfully and 'unequivocally' asserted a position in a prior proceeding that is 'wholly inconsistent' with the new position now taken." *Szyszlo*, 296 Mich App at 51, quoting *Paschke v Retool Indus*, 445 Mich 502, 509-510, 519 NW2d 441 (1994).

"Under the prior success model of judicial estoppel, a party who has successfully and unequivocally asserted a position in a prior proceeding is estopped from asserting an inconsistent position in a subsequent proceeding." *Spohn*, 296 Mich App at 480 (quotation marks and citation omitted). "[W]ith this model of judicial estoppel, the mere assertion of inconsistent positions is not sufficient to invoke estoppel; rather, there must be some indication that the court in the earlier proceeding accepted the party's position as true." *Id*. (quotation marks and citation omitted). "The prior success model, however, does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits." *Id*. (quotation marks and citation omitted). "This 'prior success' model 'focus[es] less on the danger of inconsistent claims, than on the danger of inconsistent rulings.' " *Duncan v Michigan*, 300 Mich App 176, 190; 832 NW2d 761 (2013), quoting *Paschke*, 445 Mich at 510 n 4.

"More specifically, in the context of bankruptcy proceedings," three elements must be met for the doctrine of judicial estoppel to apply. *Spohn*, 296 Mich App at 480. First, the plaintiff must have "assumed a position that was contrary to the one that [it] asserted under oath in the bankruptcy proceedings[.]" *Id*. at 480-481 (quotation marks and citation omitted). Second, the bankruptcy court must have "adopted the contrary position either as a preliminary matter or as part of a final disposition[.]" *Id*. at 481 (quotation marks and citation omitted). Third, the plaintiff's "omission" must not have "result[ed] from mistake or inadvertence." *Id*. (quotation marks and citation omitted). To determine whether the plaintiff's conduct resulted from mistake or inadvertence, courts consider three factors: (1) whether the plaintiff "lacked knowledge of the factual basis of the undisclosed claims," (2) whether the plaintiff "had a motive for concealment," and (3) whether "the evidence indicates an absence of bad faith," which looks, "in particular, at [the plaintiff's] 'attempts' to advise the bankruptcy court of [the plaintiff's] omitted claim." *Id*. (quotation marks and citation omitted; alterations in *Spohn*).

1. ASSUMPTION OF A CONTRARY POSITION

"[T]o establish the first requirement for the imposition of judicial estoppel, it must be shown that the plaintiff assumed a position that was contrary to the one that [it] asserted under oath in the bankruptcy proceeding[.]" *Spohn*, 296 Mich App at 481 (quotation marks and citation omitted). In *Spohn*, the plaintiff "did not include her potential sexual harassment lawsuit on her bankruptcy petition and did not amend that petition to list the possible cause of action while the

bankruptcy remained pending." *Id*. "This failure to disclose the potential lawsuit was contrary to the bankruptcy code," this Court explained, "which requires a debtor to file a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs." *Id*. This is because "[i]t is routinely recognized that a potential cause of action constitutes an asset that must be included . . . ." *Id*.

In this case, as in *Spohn*, 296 Mich App at 481, it is undisputed that Midtown "did not include [its] potential [claim to quiet title] on [its] bankruptcy petition and did not amend that petition to list the possible cause of action while the bankruptcy remained pending." *Spohn*, 296 Mich App at 481. Midtown filed its Schedule B (Personal Property) on March 10, 2014, and did not accurately identify the lease, much less Midtown's potential claims under it. On Schedule B, Midtown was required to list "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," as well as an "estimated value of each." Midtown identified none. Even on Schedule G (Executory Contracts and Unexpired Leases), Midtown did not list its lease with defendant, describing it instead as a "Parking Lot lease" with "Robert Slattery," its—and plaintiff's—sole owner and president. Midtown never amended its petition in this regard, and even during the "meeting of creditors/ Section 341 hearing" on March 19, 2014, Slattery downplayed the value of the lease, commenting that defendant "pay[s] taxes and they give me $600 in food cards" and described his failure to accurately list the lease as "just an oversight." Therefore, the first requirement for judicial estoppel was met.

## 2. ADOPTION OF THE CONTRARY POSITION

"To establish the second requirement for the imposition of judicial estoppel, it must be shown that the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition[.]" *Spohn*, 296 Mich App at 483 (quotation marks and citation omitted). Specifically, "[t]o establish 'adoption,' it must only be shown that the bankruptcy court confirmed [the debtor's] plan, which [does] not refer to [his or her] potential . . . lawsuit." *Id*. (citation omitted). In *Spohn*, "the second requirement of 'adoption' for judicial estoppel was established" "[b]ecause it [was] undisputed that the bankruptcy court confirmed [the debtor's] Chapter 13 plan . . . ." *Id*. In this case, it is likewise undisputed that the bankruptcy court confirmed Midtown's plan of reorganization and granted final approval of the disclosure statement on July 15, 2014. Therefore, the second requirement was met.

## 3. MISTAKE OR INADVERTENCE

"To establish the third requirement for the imposition of judicial estoppel, it must be shown that the plaintiff's omission did not result from mistake or inadvertence." *Spohn*, 296 Mich App at 483 (quotation marks and citation omitted). Again, to determine whether the plaintiff's conduct resulted from mistake or inadvertence, courts consider three factors: (1) whether the plaintiff "lacked knowledge of the factual basis of the undisclosed claims," (2) whether the plaintiff "had a motive for concealment," and (3) whether "the evidence indicates an absence of bad faith," which looks at, "in particular, [the plaintiff's] 'attempts' to advise the bankruptcy court of [the plaintiff's] omitted claim." *Id*. at 481 (quotation marks and citation omitted; alterations in *Spohn*).

In this case, as in *Spohn*, plaintiff "cannot legitimately dispute that [it] was aware and had knowledge of the factual basis of the undisclosed claim." *Spohn*, 296 Mich App at 483-484. Indeed, as previously indicated, Midtown filed its Schedule B (Personal Property) on March 10, 2014, and did not accurately identify the lease, much less Midtown's potential claims under it. Midtown also failed to list "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims," as well as an "estimated value of each." In fact, even on Schedule G (Executory Contracts and Unexpired Leases), Midtown only referenced a parking lot lease with Robert Slattery but not its lease with defendant or the alleged default on the lease. Midtown never amended its petition even after the Section 341 hearing on March 19, 2014, where it failed to mention none of Midtown's disputes with defendant.

On appeal, plaintiff does not meaningfully argue that its failure to identify these claims was the product of a mistake or inadvertence. Rather, it states that "it was not to necessarily be contemplated that [defendant]'s breaches should require the need for the instant litigation, as it would have and should have been expected that [defendant] would comply with the Lease and correct their deficiencies that [led] to default." Repeatedly, plaintiff asserts that "[t]he claims present in the instant case only became known, practical, and exercisable after the bankruptcy of [plaintiff's] predecessor-in-interest was filed," that its "claim for quiet title . . . only arose after the June 30, 2015 termination of the Lease," that "Midtown did not fail to disclose a known claim on its bankruptcy petition because the present litigation began five . . . years after that bankruptcy petition," that "Midtown did not list this as a potential claim because it could not have contemplated litigation five . . . years before it was filed," and, ultimately, that "[t]he termination of the Lease was a fact that occurred after the bankruptcy, thus judicial estoppel could not have applied to such a fact."

We reject these arguments. As this Court has previously made clear, a "debtor need not know all the facts or even the legal basis for the cause of action" before the debtor is required to identify and disclose it. *Spohn*, 296 Mich App at 482 (citation omitted). "[R]ather, if the debtor has enough information . . . prior to confirmation to suggest that it *may* have a *possible* cause of action, then that is a known cause of action such that it must be disclosed." *Id*. (citation omitted; emphasis added). In other words, "[a]ny claim with *potential* must be disclosed, even if it is contingent, dependent, or conditional." *Id*. (citation omitted; emphasis added). "Further, the duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required to disclose all potential causes of action." *Id*. (quotation marks and citation omitted).

The record in this case establishes that plaintiff had more than enough information to indicate that it may have a possible claim to quiet title against defendant before 2014. *Spohn*, 296 Mich App at 482. According to plaintiff's "Timeline of Relevant Events"[4], defendant built a noncompliant fence on the West Lot in 2010, acknowledged the default and agreed to fix it in 2011, and still had not fixed the fence, grading, and other items by 2012. Slattery made it clear from the outset that he wanted a new fence: "I want the same fence [on the West Lot that] you installed for yourself [on the Slow's Lot]."

---

[4] Plaintiff filed its motion for summary disposition on December 4, 2020, and included a two-page chart summarizing notable events in the parties' history.

By June 21, 2011, the parties' disputes had grown so contentious that Midtown ordered defendant to stop all work on the parking lot. On June 29, 2011, Midtown declared defendant in default of the lease. On July 21, 2011, Midtown terminated the lease for the first time. And in October 2011, Midtown threatened eviction.

All of this occurred well before Midtown's 2014 bankruptcy filings. Clearly, plaintiff was undisputedly aware "that it *may* have a *possible* cause of action" that must be disclosed." *Spohn*, 296 Mich App at 482 (citation omitted; emphasis added). But even if it was not enough on its own, plaintiff's "Timeline of Relevant Events" indicates that Midtown terminated the lease in 2012, more than a year before it filed for bankruptcy.

Furthermore, the bankruptcy court did not confirm Midtown's reorganization plan until July 15, 2014. Yet just two months after that, on September 24, 2014, Midtown apparently had enough information to terminate the lease for a third time. Between the information that enabled it to terminate the lease a few months after the confirmation order in the bankruptcy case and the previous purported terminations of the lease on July 21, 2011 and October 15, 2012, plaintiff "ha[d] enough information . . . prior to confirmation to suggest that it *may* have a *possible* cause of action, then that is a known cause of action such that it must be disclosed." *Spohn*, 296 Mich App at 482 (citation omitted; emphasis added). Therefore, the third element is met as well.

Plaintiff claims that this outcome is at odds with a "good business practice." According to plaintiff, "[i]t would not be good practice for a lessor to resort to, or even contemplate, rushing to court on matters that could be addressed (and in fact, were, at least in attempt on the part of [plaintiff]) and should be addressed through simple business matters and discussions." This argument lacks merit. Perhaps plaintiff's claim to quiet title was "contingent, dependent, or conditional" on Midtown and defendant not resolving the dispute "through simple business matters and discussions," but the "contingent, dependent, or conditional" nature of a potential claim does not relieve a debtor of the obligation to disclose it. *Spohn*, 296 Mich App at 482. Otherwise, debtors could decline to disclose lucrative claims—or, put differently, assets—simply because there was a possibility that the claim could be resolved out of court. That is not the standard that applies to bankruptcy disclosures and, in fact, undermines the very rationale for it.

As this Court previously recognized in *Spohn*, the rationale for "[t]he disclosure obligations of debtors" makes sense because they are "essential to the bankruptcy process:"

> The rationale for . . . decisions [invoking judicial estoppel to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy] is that the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. The courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding. The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete. [*Spohn*, 296 Mich App at 482 (citation omitted).]

Granting the relief plaintiff seeks would directly undermine this rationale. Plaintiff, via Midtown, would be permitted "to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for [its] own benefit in a separate proceeding." *Spohn*, 296 Mich App at 482 (citation omitted). This Court's decision in *Spohn* squarely prohibits plaintiff from doing so. Therefore, plaintiff's arguments in this regard lack merit.

Furthermore, when it comes to whether the plaintiff "had a motive for concealment," *Spohn*, 296 Mich App at 481 (citation omitted; alterations in *Spohn*), it is important to point out the ways in which plaintiff's owner has changed his positions throughout the two cases. In the bankruptcy case, Midtown originally indicated to the bankruptcy court that its "Parking Lot lease" was with "Robert Slattery," not defendant. That was not true. Then, during the Section 341 hearing, Slattery downplayed the lease's value, saying that the rent only included "taxes and "$600 in food cards," i.e., "not a lot of money." But during the case at bar, plaintiff alleges that the lease was much more valuable, pointing to, among other things, a fence that it claims was worth more than $20,000.

Slattery also stated, or at least heavily implied, during the 341 hearing that the lease was ongoing. Yet, in this case, plaintiff claimed that Midtown terminated the lease for the first time on October 15, 2012, and the evidence suggests that Midtown actually terminated for the first time more than a year earlier.[5]

As this Court explained in *Spohn*, 296 Mich App at 485, "in accordance with caselaw, a presumption regarding a motive to conceal exists because '[i]t is always in a . . . petitioner's interest to minimize income and assets' in order to secure payment directly rather than to the debtor's estate.' " (Quotation marks and citation omitted.) And plaintiff's failure to initially disclose its possible lawsuit or to later amend its bankruptcy schedules suggest a motive for concealment. *Id*. In light of Midtown's, plaintiff's, and Slattery's changing positions in the two cases, there is nothing to support the idea that plaintiff overcame this presumption.

Plaintiff claims that "Slattery corrected the innocent mistake on the record in bankruptcy court." It is true that, "[w]hen considering whether 'the evidence indicates an absence of bad faith,' courts will look, in particular, at the plaintiff's 'attempts' to advise the bankruptcy court of the omitted claim." *Spohn*, 296 Mich App at 486-487 (citation omitted). "More specifically, courts primarily examine a plaintiff's efforts to *correct the bankruptcy schedules* and to make the bankruptcy court aware of *any initially undisclosed claims*." *Id*. at 487 (emphasis added). But, in *Spohn*, the fact that the debtor "did not inform the bankruptcy court of the potential sexual harassment lawsuit or make any attempts to amend her bankruptcy petition" "support[ed] that [the debtor] was acting in bad faith." *Id*. Midtown also made no attempts to inform the bankruptcy court about any potential claims and did not amend the bankruptcy schedules.

---

[5] Even in this case, plaintiff has seemingly changed its position regarding when the lease terminated, switching from the argument that it terminated the lease on October 15, 2012, on September 24, 2014, and on June 30, 2015, in the trial court to the argument that it terminated the lease on June 30, 2015, in its brief on appeal, without mentioning the other dates.

Furthermore, plaintiff's argument about supposedly correcting an innocent mistake misstates the record. Again, Slattery downplayed the lease's value during the bankruptcy case. Slattery did not mention any potential claims Midtown may have had against defendant, did not mention that Midtown and defendant had been in a contentious back-and-forth over a fence at the West Lot purportedly worth more than $20,000, did not mention the fact that Midtown purportedly terminated the lease multiple occasions, and did not mention that defendant never left the property after each of those purported terminations. Ultimately, Midtown's and Slattery's failure to give any indication of a potential—and, in fact, the ongoing—dispute with defendant "supports that [Midtown] was acting in bad faith." *Spohn*, 296 Mich App at 487.

In sum, because Midtown did not identify any possible claims that it may have had against defendant in the bankruptcy proceedings, because the bankruptcy court adopted Midtown's reorganization plan without knowledge of those potential claims, and because Midtown's omission of those potential claims was not the product of a mistake or inadvertence, the trial court correctly held that plaintiff's claim to quiet title was barred by judicial estoppel, even if the trial court did not specifically address that claim on its own. In light of this conclusion, we need not address the substance of plaintiff's claim to quiet title, the 15-year statute of limitations that applied to it, or the trial court's analysis of those issues.

## B. ATTORNEY FEES

In Docket No. 362366, defendant asks this Court to remand this matter to the trial court to substantively address defendant's request for attorney fees under the lease's "Lessor's Fees and Expenses" provision. The trial court declined to do so, concluding "that MCR 7.208(A) precludes the Court from awarding the relief sought in the motion and, therefore, the motion is denied." But "once the appeal is resolved, or if the Court of Appeals otherwise returns jurisdiction over the matter to this Court," the trial court explained, defendant would be permitted to "enforc[e] its claim for attorney fees . . . ." In light of our foregoing analysis, we grant defendant's request, but make it clear that our decision to do so does not imply whether defendant is entitled to attorney fees under the lease's "Lessor's Fees and Expenses" provision.

## III. CONCLUSION

In Docket No. 361612, we affirm the trial court's May 13, 2022 opinion and order. In Docket No. 362366, we remand this matter for further proceedings with respect to defendant's request for attorneys so that the trial court can substantively address the issue for the first time.

Affirmed and remanded. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Kathleen A. Feeney

-10-